[Nos. 16073-1-II; 16347-1-II.    Division Two.    September 7, 1994.]

THE STATE OF WASHINGTON, *Respondent*, v. TAMARA SUE JOHNSON, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. JAMES RAYMOND JOHNSON, *Appellant*.

694

*Jeffrey Steinborn, Angela Anderson* and *Steinborn & Associates,* for appellants.

*Patrick D. Sutherland, Prosecuting Attorney,* and *Jon Tunheim, Deputy,* for respondent.

ALEXANDER, J. — Tamara Sue Johnson appeals her conviction on a charge of possession of marijuana. Her husband and codefendant, James Raymond Johnson, appeals his convictions on charges of possession of marijuana with intent to deliver, manufacture of marijuana, and first degree defrauding of a public utility. They each contend that the trial court erred in denying their motions to suppress evidence, arguing that the evidence was seized pursuant to an invalid warrant. Both Appellants raise additional issues, but because of our resolution of the suppression issue, we need not address them. We reverse.

On August 16, 1991, a "concerned citizen" contacted the United States Drug Enforcement Administration (DEA) to report a "large marijuana growing operation" being conducted by "Jim Johnson" on his property near Scott Lake in Thurston County.[1] The informant also told a DEA agent that Johnson had recently been "involved" in an airplane crash on Scott Lake.

Following up on the information provided by the informant, DEA special agents Hedman and Parr went to the offices of the Thurston County Narcotics Task Force (TNTF) in Lacey, where they spoke to Detective Stines. Stines investigated some of the information the informant had provided to the DEA and confirmed that a person by the name of James Johnson had been involved in an airplane crash on Scott Lake. She also confirmed that James Johnson lived at

---

[1]Neither party has assigned error to the trial court's findings of fact following the suppression hearing. Thus, we consider the unchallenged findings to be verities on appeal. *State v. Hill,* 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

11801 Tilley Road South in Olympia, a location near Scott Lake.

Armed with this additional information, Hedman and Parr, accompanied by Stines, drove to the vicinity of James Johnson's property. They found, however, that Johnson's property was accessible only by a dirt road that ran through Millersylvania State Park.

Hedman, Parr, and Stines walked down the dirt road through the park, but stopped at a closed gate that marked the boundary of Johnson's property. The gate was a "chain link gate" with a fence extending out from both sides. They observed that signs reading "Private Property" and "No Trespassing" were posted on both sides of the fence and on a tree behind the fence. From that location, Hedman and Parr were unable to observe any buildings on Johnson's property. After making these observations, the three law enforcement officers left the scene without entering Johnson's property.

On August 18, 1991, Hedman and Parr returned to Thurston County. On this occasion, they visited the Thurston County Assessor's office and confirmed that the property at 11801 Tilley Road was owned by Tamara and James Johnson. On two occasions between August 16 and 22, TNTF officers, at the request of DEA agent Hedman, took aerial photographs of the Johnsons' property. These photographs were turned over to the DEA.

On August 19, 1991, shortly before 1 a.m., DEA agents Hedman and Parr returned to the Johnsons' property, this time without Detective Stines. Under cover of darkness, they walked through Millersylvania State Park to the gate marking the Johnsons' property. Finding the gate closed but unlocked, they opened it and proceeded down the dirt road onto the Johnsons' property.

About 200 yards past the gate, the agents observed a barn. They approached to within 10 yards of the barn, and, at this location, they both smelled the "odor of green growing marijuana". The agents also heard the "operation of machinery that they associated with a potential grow operation". They then aimed a "Thermal Imaging Device" at the barn

and obtained readings that indicated to them the possible presence of a marijuana grow operation.[2] While the agents were standing on the road near the barn, they could see a residence approximately 75 to 100 yards from the barn. They did not approach the house.

At this point, agents Hedman and Parr retraced their route and left the Johnsons' property. Later that day, Hedman obtained records showing power consumption at the Johnsons' property. These records showed "very low electrical usage . . . consistent with an indoor marijuana growing operation".

Hedman prepared an affidavit containing essentially the facts set forth above and submitted it to a United States magistrate. The magistrate issued a search warrant authorizing a search for evidence of a marijuana grow operation at 11801 Tilley Road South in Olympia. The search warrant was executed by DEA agents Hedman and Parr together with six TNTF officers, at least one Washington State Patrol trooper, and a Lacey police officer. A marijuana grow operation was discovered in the barn on the property. James Johnson was arrested and "[t]urned over to the local authorities, Thurston County". Some of the evidence obtained in the search was transferred to TNTF officers.

Tamara Johnson was subsequently charged with one count of possession of marijuana. James Johnson was charged with one count each of possession of marijuana with intent to deliver, manufacture of marijuana, and first degree defrauding of a public utility. Each moved to suppress all of the evidence that had been seized pursuant to the search warrant, contending that the warrant was based on information discovered during a search that violated both the state and federal constitutions. The Johnsons argued that because the DEA agents were working in cooperation with state officers, the DEA agents were subject to the con-

---

[2] A thermal imaging device is a "passive, non-intrusive system which detects differences in the temperature of an object being observed". When aimed at a structure, the device highlights "man-made heat sources" as a white color and cooler temperatures by shades of gray.

straints of article 1, section 7 of the Washington State Constitution, and that even if they had been acting without assistance of state officers, their actions violated the fourth amendment to the United States Constitution.

At a hearing on the Defendants' motion to suppress, Agent Hedman was the only witness to testify. His testimony was consistent with the facts set forth above. Following the hearing, the trial court concluded that the DEA agents had acted without the cooperation or assistance of state officers, and were, therefore, not subject to the constraints of the Washington Constitution. It further concluded that the actions of the DEA agents did not violate the Fourth Amendment. Based on these conclusions, the trial court denied the motions of both Defendants.[3]

Tamara Johnson and James Johnson were both convicted of all charges at a bench trial. Each appealed, and their appeals were consolidated by this court.

I

The Johnsons contend that the trial court erred in denying their motions to suppress the evidence seized as a result of the search conducted pursuant to the search warrant. They assert that the warrant was invalid because it was based on the activity of DEA agents that was violative of article 1, section 7 of the Washington State Constitution, as well as the fourth amendment to the United States Constitution. Absent the tainted evidence, the Johnsons contend, the warrant contained insufficient evidence to establish probable cause to support its issuance.

When a party alleges a violation of a right that is protected by both the Federal and Washington Constitutions, it is appropriate to examine the state constitutional claim first. *State v. Young*, 123 Wn.2d 173, 178, 867 P.2d 593

---

[3]The trial court did not enter written findings of fact and conclusions of law at the conclusion of this hearing as required by CrR 3.6. Although the failure to submit written findings and conclusions pursuant to CrR 3.6 is error, it is harmless as long as the trial court's oral findings are sufficient to permit appellate review. *State v. Riley*, 69 Wn. App. 349, 352-53, 848 P.2d 1288 (1993). In our judgment, the trial court's oral ruling in this case is sufficiently detailed to permit review.

(1994); *Forbes v. Seattle*, 113 Wn.2d 929, 934, 785 P.2d 431 (1990); *O'Day v. King Cy.*, 109 Wn.2d 796, 801-02, 749 P.2d 142 (1988). Before reaching the issue of whether a citizen of this state is afforded greater protection under article 1, section 7 of our state constitution than under the Fourth Amendment, we must first address the question of whether the Washington State Constitution applies to the actions of the DEA agents. The State contends that because the DEA agents were conducting an independent federal investigation when they obtained the evidence that they summarized in the affidavit they submitted in support of issuance of the warrant, the Washington State Constitution does not come into play.

As a general principle, evidence that is lawfully obtained by federal officers pursuant to federal law is admissible in proceedings in courts of this state even if the Washington State Constitution would have required exclusion of evidence obtained in a similar manner by state officials. *In re Teddington*, 116 Wn.2d 761, 772-73, 808 P.2d 156 (1991); *State v. Gwinner*, 59 Wn. App. 119, 124-25, 796 P.2d 728 (1990) (explaining development of the "silver platter" doctrine), *review denied*, 117 Wn.2d 1004 (1991). "Neither state law nor the state constitution can control federal officers' conduct." *State v. Bradley*, 105 Wn.2d 898, 902-03, 719 P.2d 546 (1986). The Washington Supreme Court in *Teddington* quoted a New Jersey case, *State v. Mollica*, 114 N.J. 329, 352, 554 A.2d 1315, 1327 (1989), where the court concluded that "[s]tated simply, state constitutions do not control federal action."

■■ A critical limitation to the so-called "silver platter" doctrine is that "the federal officer must not have been acting as an agent for the state at the time the officer acquired the evidence." *Teddington*, 116 Wn.2d at 774. Indeed, Division One of this court has indicated that the "silver platter" doctrine is subject to a " 'vital significant condition': that the federal officers acted without the cooperation or assistance of state officers." *Gwinner*, 59 Wn. App. at 125 (quoting *Mollica*, at 357-58). In *Gwinner*, the court set forth a number of

factors that a court should consider in making this determination:

> [A]ntecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. On the other hand, mere contact, awareness of ongoing investigations, or the exchange of information may not transmute the relationship into one of agency.

*Gwinner*, 59 Wn. App. at 125 (quoting *Mollica*, at 356).

We recognize that in *Gwinner* the court variously used the terms "agency" and "agent" to describe the relationship between federal and state officers that must exist before the state constitution is implicated, suggesting the need for a formal agency relationship. As we have observed, however, the *Gwinner* court emphasized that the "vital significant condition" to the "silver platter" doctrine was that federal agents acted without "cooperation and assistance" of state officers, which is clearly a different standard than formal agency. *Gwinner*, 59 Wn. App. at 125. Our reading of *Gwinner* causes us to believe that when the court used the term "agency", it did not intend to hold that a formal agency relationship must exist before state constitutional protections are triggered. In our judgment, the term appears to have been used by the *Gwinner* court in a more informal sense. We conclude, therefore, that federal officers are subject to our State's constitution if they are acting with the cooperation and assistance of state officers. The factors relied on in *Gwinner* and *Mollica*, which themselves do not appear to necessarily contemplate formal agency, should be the guide.

The Johnsons assert that there was "cooperation or assistance" between federal and state agents sufficient to trigger the protections afforded by the state constitution. To support their argument they rely on the following facts: (1) on August 16, Detective Stines of TNTF accompanied the DEA agents to investigate the Johnsons' property; (2) on that same day, Stines assisted DEA agents in verifying James Johnson's address, and investigated and confirmed

other details provided by the informant; (3) on two occasions between August 16 and 22, TNTF officers took aerial photographs of the Johnsons' property at the request of the DEA and supplied them to the DEA; (4) state and local officers accompanied the DEA agents when they executed the warrant; (5) numerous pieces of evidence seized at the Johnsons' property were turned over to TNTF officers; and (6) James Johnson was turned over to Thurston County law enforcement officers after his arrest.

The State responds that federal authorities were acting independently, asserting that state officers were only involved "to the extent of obtaining local information". The State argues that DEA agents independently obtained power records and records showing ownership of the property. It points to *Gwinner*, where the court concluded that a mere "transfer of information by telephone" did not establish an "agency" relationship. 59 Wn. App. at 125-26.

The assistance and cooperation of the state agents here was significantly greater than what it was in *Gwinner*. The number of contacts between state and federal authorities was clearly more substantial, and the nature of those contacts was more extensive than the mere transfer of one bit of information by telephone. TNTF Detective Stines did not merely give directions and an address to the DEA agents. Rather, she helped the federal agents in their investigation, actually accompanying them to the Johnsons' property during the course of the investigation. In addition, state officers took aerial photographs of the property at the request of the DEA on two occasions and then supplied the photographs to the DEA. State officers were also involved in executing the warrant, gathering evidence, and prosecuting the suspects. We conclude from all of these facts that the federal and state officers were cooperating to an extent sufficient to trigger state constitutional protection.

## II

Having concluded that Const. art. 1, § 7 applies, we must determine if our State's constitution provides a level of

protection that is greater than that provided by the Fourth Amendment. That inquiry is guided by the six nonexclusive *Gunwall* factors,[4] *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986), which the parties have discussed in their respective briefs. As a general principle, it is clear that Const. art. 1, § 7 provides broader protection than does the Fourth Amendment. *Young*, 123 Wn.2d at 181. In *State v. Boland*, 115 Wn.2d 571, 576, 800 P.2d 1112 (1990), the Washington Supreme Court "adopt[ed]" *Gunwall*'s analysis of factors 1, 2, 3, and 5, and did not further address them. We will do the same. Thus, the critical factors we must examine are (4) preexisting state law and (6) matters of particular state or local concern.

■ The Johnsons correctly observe that Washington has a long tradition of protecting private property interests from unwanted intrusions. Prior to statehood, Washington allowed individuals to exclude others from their property. *See, e.g.*, Laws of 1869, § 64, p. 212; Laws of 1873, § 67, p. 195. In the intervening years, the law has not changed in that regard. Currently, a person is guilty of second degree criminal trespass if he or she "knowingly enters or remains unlawfully in or upon premises of another . . .". RCW 9A.52.080(1). In addition, the Johnsons correctly note that the ignoring of the "No Trespassing" sign is an important factor that is looked at to determine if an alleged trespasser is aware that the owner of the premises does not welcome uninvited visitors. *See, e.g., State v. Thompson*, 69 Wn. App. 436, 442, 848 P.2d 1317 (1993). In our judgment, the presence of the long history of territorial and state laws prohibiting trespass indicates that Washington places important emphasis on a person's right to exclude others from his or her private property, regardless of the size or developed state of that property. This factor is adequately met to permit analysis under Const. art. 1, § 7.

---

[4]The *Gunwall* factors are: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern. *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808, 76 A.L.R.4th 517 (1986).

■ We also agree with the Johnsons that the matter of trespass to private property is primarily of state and local concern. As we have noted, state and local laws, not federal laws, govern trespass issues. Indeed, in *Boland*, our State's Supreme Court determined that a person's right to privacy in items contained in a curbside garbage can was a matter of state and local concern. Similarly, a person's right to exclude others from his or her private property is a particular matter of state concern. As the *Gunwall* factors are satisfied, we next proceed with an analysis of the degree of protection provided by article 1, section 7 of our state constitution.

### III

■ Article 1, section 7 of the Washington State Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Because of its "unique language", it generally provides more protection against government intrusions than does the Fourth Amendment. *State v. Hansen*, 42 Wn. App. 755, 762-63, 714 P.2d 309, *aff'd on other grounds*, 107 Wn.2d 331, 728 P.2d 593 (1986). Unlike the inquiry into subjective and reasonable expectations of privacy that must be made when the Fourth Amendment is implicated, the critical inquiry under the Washington State Constitution focuses on "those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental *trespass* absent a warrant". (Italics ours.) *Young*, 123 Wn.2d at 181 (quoting *State v. Myrick*, 102 Wn.2d 506, 511, 688 P.2d 151 (1984)); *Boland*, 115 Wn.2d at 577. In other words, did the law enforcement officers unreasonably intrude into the defendant's "private affairs"? *Myrick*, 102 Wn.2d at 510.

### A

The State first asks us to view this case as one involving law enforcement officers using an accessway to a residence. Relying on *State v. Seagull*, 95 Wn.2d 898, 632 P.2d 44 (1981), it contends that a person does not have a legitimate expectation of privacy in impliedly open accessways to a residence. Consistent with that argument, the Washington

Supreme Court has held that "[i]t is clear that police with legitimate business may enter areas of the curtilage which are impliedly open, such as access routes to the house. In so doing, they are free to keep their eyes open." (Footnote omitted.) *Seagull*, at 902 (citing 1 Wayne R. LaFave, *Search and Seizure* § 2.3 (1978)). Although the court in *Seagull* was interpreting the Fourth Amendment, this holding was applied under Const. art. 1, § 7 in *State v. Vonhof*, 51 Wn. App. 33, 751 P.2d 1211 (1988), *review denied*, 111 Wn.2d 1010, *cert. denied*, 488 U.S. 1008 (1989). The State argues that, because the DEA agents approached the house by the impliedly open access area, their actions did not constitute a search within the meaning of Const. art. 1, § 7, and we should not, therefore, consider further if there was an unreasonable intrusion into the Johnsons' private affairs.

We reject the State's argument. The Supreme Court in *Seagull* and Division Three of this court in *Vonhof* based their holdings on a series of factors that are not present here. These include the fact that the officer "was not secretive, but acted openly in an honest attempt to talk with the occupants"; that "the acts occurred in daylight"; and that the officer was conducting "legitimate police business". *Vonhof*, 51 Wn. App. at 39; *Seagull*, 95 Wn.2d at 905. In *Vonhof*, the court held that a tax appraiser who smelled marijuana after he entered and approached a house in daylight while revaluing the property for tax purposes was not conducting a search within the meaning of Const. art. 1, § 7. Similarly, in *Seagull*, a police officer approached a house in daylight to question the occupants about an abandoned vehicle with bloodstains that had been found in the neighborhood. While at the house, the officer saw what he believed was a marijuana plant growing in a greenhouse.

■ Here, the DEA agents were not using the road merely as a way to gain access to the Johnsons' house. Rather they were using it as the most convenient route on which to trespass on the Johnsons' property. The record demonstrates that the DEA agents never attempted to approach the house or contact the occupants. Indeed, it is obvious that they had

no intention of doing so; rather they furtively entered the Johnsons' property under cover of darkness in an apparent effort to look for a marijuana grow operation. Unlike the officers in *Seagull* and *Vonhof*, their only purpose was to conduct a search and gain information by trespassing on private property.[5]

In addition to concluding that the DEA agents were not using the road as an accessway to approach the Johnsons' house and contact the residents, we further conclude that the accessway was not impliedly open. In *State v. Ridgway*, 57 Wn. App. 915, 790 P.2d 1263 (1990), we cited *Seagull*, but rejected its application where

> the undisputed physical facts of this case do not allow the inference that Ridgway opened his property to uninvited visitors. The house is located in an isolated setting, hidden from the road and from neighbors. The long driveway is blocked by a closed gate, demonstrating a subjective expectation of privacy in the area beyond the gate.

57 Wn. App. at 918. Although *Ridgway* was decided under the Fourth Amendment, it undercuts the State's attempt to justify the DEA agents' actions as merely entering the impliedly open access area. Here, as in *Ridgway*, the access way to the property was not open, the Johnsons manifesting their subjective intent to close their property by fencing it, erecting a gate, and placing signs near the gate saying "No Trespassing" and "Private Property".

---

[5]The recent decision of Division One in *State v. Hornback*, 73 Wn. App. 738, 871 P.2d 1075 (1994) is distinguishable. In that case, police officers drove up the driveway of a person whom they suspected of operating a marijuana grow operation. The officers' purpose was to "contact the defendant, observe the house, and . . . check for the smell of marijuana." 73 Wn. App. at 740. The officers smelled marijuana when making contact with the occupant and they later used this and other information obtained on the property in an affidavit to support a search warrant application. Concededly, the officers had no legitimate purpose (other than to search for evidence) when entering the driveway. The court upheld the validity of the search. Two critical distinctions, however, distinguish the facts in *Hornback* from our case. In *Hornback*, the officers entered the driveway in daylight. They also stopped their vehicle in the parking area and made contact with an occupant. Here, as we have observed above, the DEA agents entered the Johnsons' property at night, and they made no effort to approach the residence or contact the occupants.

■ We briefly address the State's contention, based on *Vonhof*, that the presence of a "No Trespassing" sign does not increase a person's level of privacy in his or her property, or withdraw permission for police officers to enter accessways to the property. Clearly, the existence of a "No Trespassing" sign is not dispositive of the establishment of privacy.[6] In our judgment, however, it is a factor that is to be considered in conjunction with other manifestations of privacy, such as a closed gate or a fence. *Accord State v. Dixson*, 307 Or. 195, 766 P.2d 1015 (1988). Together, such factors can establish that an access road is not impliedly open. Under the circumstances present here, the fact that there were "No Trespassing" and "Private Property" signs, combined with other manifestations of privacy, indicate that the Johnsons withdrew any permission that arguably may be implied for the DEA agents to use the accessway, especially at 1 a.m.

## B

The State next contends that because the agents did not enter the curtilage of the Johnsons' house, their entry into what they assert are open fields should not be viewed as an unreasonable intrusion into the Johnsons' private affairs. We agree that the DEA agents did not enter the curtilage of the house, the barn not appearing to be within the area intimately tied to the home.[7] This fact, however, does not end the analysis under the Washington Constitution.

---

[6]Two recent Division One cases rejected the argument that a "No Trespassing" sign establishes an expectation of privacy. In *State v. Chaussee*, 72 Wn. App. 704, 710, 866 P.2d 643 (1994), the defendant placed signs on a neighbor's property, and there was no fence or gate present. In *Hornback*, 73 Wn. App. at 743-44, the property had no closed gate and a house was visible from the street. In both of these cases, the courts concluded that "No Trespassing" signs did not withdraw implied permission allowing an officer to enter an access route to the house.

[7]Courts have recognized a legitimate expectation of privacy in the curtilage, which is that area "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Ridgway*, 57 Wn. App. at 918 (quoting *United States v. Dunn*, 480 U.S. 294, 301, 94 L. Ed. 2d 326, 107 S. Ct. 1134 (1987)). Curtilage questions are resolved with reference to four factors: (1) the proximity of the area claimed as curtilage to the home; (2) whether the area is included in an enclosure surrounding the house; (3) the

Washington has rejected the "open fields" doctrine of *Oliver v. United States*, 466 U.S. 170, 80 L. Ed. 2d 214, 104 S. Ct. 1735 (1984). *Myrick*, 102 Wn.2d at 512. For purposes of Const. art. 1, § 7, "Neither the open fields doctrine of *Oliver*, which looks to the nature of the property viewed, nor the reasonable expectations test of *Katz* [*v. United States*, 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967)] are solely dispositive, but rather, each serves as a factor [that may be used] in determining whether the entry onto the property unconstitutionally intruded into a person's 'private affairs'." *State v. Crandall*, 39 Wn. App. 849, 853-54, 697 P.2d 250 (quoting *Myrick*, 102 Wn.2d at 510-11), *review denied*, 103 Wn.2d 1036 (1985). Unlike Fourth Amendment law, where it has been determined that a person's expectation of privacy in an "open field", even if subjectively manifested, is not deemed objectively reasonable or "legitimate", *see Oliver*, 466 U.S. at 182-83, our state constitution does not foreclose a person's ability to protect his or her private affairs in an "open field". *Myrick*, 102 Wn.2d at 510-11.

Several cases have dealt with the question of whether an officer's intrusion onto an "open field" is invalid under Const. art. 1, § 7. In *Crandall*, Division Three of this court concluded that there was no unreasonable intrusion onto "open fields" when a deputy sheriff trespassed onto the defendant's property. In that case, the court noted that the "open fields" at issue were "not posted" and were "admittedly frequented by hunters". *Crandall*, 39 Wn. App. at 854. In *Hansen*, Division Three similarly concluded that a police officer did not unreasonably intrude onto "open fields" because the fields were "not posted and were clearly visible to [the defendants'] neighbors and to any passersby." *Hansen*, 42 Wn. App. at 763.

Unlike *Crandall* and *Hansen*, there is, as we have observed, substantial evidence that the Johnsons manifested their desire to exclude others from their "open fields". They posted multiple signs, including ones which read "No Tres-

nature of the uses to which the area is put; (4) the steps taken by the resident to protect the area from passersby. *Dunn*, 480 U.S. at 301; *State v. Niedergang*, 43 Wn. App. 656, 660, 719 P.2d 576 (1986).

passing" and "Private Property". In addition, they placed a chain link gate and fence around their property and closed their gate. Indeed, the Johnsons appear to have done everything that one could imagine to warn others that they did not want uninvited visitors on their land. Nevertheless, the DEA agents, acting in cooperation with state officials and without a warrant, unreasonably intruded into the Johnsons' "private affairs", in this case the Johnsons' "open field", when in the early morning hours they ignored the Johnsons' fence, gate, and signs and trespassed on their property.[8]

We believe there are strong policy reasons why the activities carried on by the DEA agents are not acceptable under our state constitution. As Judge McInturff indicated in his dissent in *Crandall*:

> practical considerations suggest that the police should not be empowered to invade land closed to the public. In many parts of the country, landowners feel entitled to use self-help in expelling trespassers from their posted property. There is thus a serious risk that police officers, making unannounced, warrantless searches of "open fields," will become involved in violent confrontations with irate landowners, with potentially tragic results.

39 Wn. App. at 861 (quoting *Oliver*, 466 U.S. at 195 n.19 (Marshall, J., dissenting)). Even given the fact that the DEA agents remained on the dirt road and did not stray elsewhere onto the property, their presence on the Johnsons' land at 1 a.m. could easily have resulted in the kind of "violent confrontation[]" which concerned Judge McInturff. 39 Wn. App. at 861. Indeed, the danger of such a confrontation would be heightened considerably at night.

---

[8]The use of infrared surveillance by law enforcement on a private dwelling has been found by the Washington Supreme Court to violate article 1, section 7 of the Washington State Constitution and the Fourth Amendment. *Young*, 123 Wn.2d at 184, 194. Thus, even if the DEA agents did not unreasonably intrude when they approached the barn, they might have done so when they aimed the thermal imaging device at the barn (if the barn is considered comparable to a dwelling). This aspect of the search is probably immaterial, however, as the detection of the odor of marijuana by an officer who is trained and experienced in marijuana detection (which the DEA agents were) would be sufficient evidence, by itself, to constitute probable cause to justify issuance of a warrant. *State v. Huff*, 64 Wn. App. 641, 647, 826 P.2d 698, *review denied*, 119 Wn.2d 1007 (1992).

■      We conclude that the agents' entry onto the Johnsons' property was an unreasonable intrusion into the Johnsons' private affairs. Thus, all of the evidence obtained as a result of that search should have been suppressed under Const. art. 1, § 7.[9] *See State v. White*, 97 Wn.2d 92, 112, 640 P.2d 1061 (1982); *State v. Crawley*, 61 Wn. App. 29, 34-35, 808 P.2d 773, *review denied*, 117 Wn.2d 1009 (1991).

## IV

■ ■      Because the evidence obtained as a result of the DEA agents' search was obtained in violation of the state constitution, we must examine if the warrant is supported by the untainted evidence in the affidavit.

An affidavit establishes probable cause to support a search warrant if it sets forth facts sufficient to allow a reasonable person to conclude that there is a probability that the defendant is involved in criminal activity and that evidence of the crime can be found at the place to be searched. *Young*, 123 Wn.2d at 195; *State v. Maxwell*, 114 Wn.2d 761, 769, 791 P.2d 223 (1990); *State v. Bittner*, 66 Wn. App. 541, 545, 832 P.2d 529 (1992), *review denied*, 120 Wn.2d 1031 (1993).

Generally, we accord great deference to the issuing magistrate's determination of probable cause, and doubts are resolved in favor of the warrant. *State v. Kalakosky*, 121 Wn.2d 525, 531, 852 P.2d 1064 (1993). Of course, in reviewing the issuing magistrate's determination in this case, we must determine if probable cause existed in the absence of the invalid information. *State v. Coates*, 107 Wn.2d 882, 888, 735 P.2d 64 (1987).

■ ■      Here, the affidavit submitted in support of the warrant contained the following untainted information: a tip from a "concerned citizen" that James Johnson was growing marijuana; corroboration of some details provided by the "concerned citizen"; information from the Thurston County Tax Assessor's office that Johnson owned the property at

---

[9]Because we conclude that Const. art. 1, § 7 prohibited the search performed by the DEA agents, we need not address whether the search also violated the Fourth Amendment.

11801 Tilley Road; and public utility records showing low electricity consumption. In our judgment, this information was insufficient to establish probable cause. The tip was anonymous, and is insufficient to provide probable cause. Washington, of course, still adheres to the more stringent *Aguilar-Spinelli*[10] test for anonymous informant information. *See State v. Jackson*, 102 Wn.2d 432, 443, 688 P.2d 136 (1984). The ownership records and the existence of an airplane crash on Scott Lake are merely innocuous details. Finally, the power consumption records, alone, do not establish probable cause.[11] *See State v. Sterling*, 43 Wn. App. 846, 851-52, 719 P.2d 1357, *review denied*, 106 Wn.2d 1017 (1986). There was insufficient untainted evidence to support issuance of the warrant.

Reversed with directions to dismiss.

MORGAN, C.J., and HOUGHTON, J., concur.

Review denied at 126 Wn.2d 1004 (1995).

---

[10]*Spinelli v. United States*, 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969); *Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964).

[11]The trial court, noting that power records were not presented at the CrR 3.6 hearing, indicated that it did not consider power usage in reaching its decision to deny the Defendants' motion to suppress.