**COMMONWEALTH of Pennsylvania**

v.

**Joseph RUSSO, Jr., Appellant.**

Commonwealth Court of Pennsylvania.

Argued Dec. 6, 2004.

Decided Jan. 7, 2005.

Andrew D. Bigda, Wilkes–Barre, for appellant.

George P. Skumanick, Jr., Tunkhannock, for appellee.

BEFORE: COLINS, President Judge, PELLEGRINI, Judge, and COHN JUBELIRER, Judge.

OPINION BY Judge COHN JUBELIRER.

Joseph Russo, Jr. (Russo) appeals from the judgment of sentence imposed by the Criminal Division of the Court of Common Pleas of the 44th Judicial District, Wyoming County Branch (trial court), which denied Russo's suppression motion and found him guilty of violating Sections 2307 and 2308 of the Game and Wildlife Code (Game Code).[1] On appeal, Russo argues that the trial court erred as a matter of law in not suppressing the evidence seized from the Commonwealth's warrantless search of his hunting camp because, under Article 1, Section 8 of the Pennsylvania Constitution of 1968, he asserts that he had an expectation of privacy in his clearly posted property.

On November 25, 2002, the first day of bear hunting season, Russo killed a bear in the early morning hours near his Wyoming County hunting camp, which consists of a two-story building surrounded by a wooded area, a logging road, and a driveway that spans about 600 feet from the logging road to the camp area. (Tr. at 4, 5, 11.) As required by Section 2323(a)(2) of the Game Code,[2] Russo brought the bear to

1. 34 Pa.C.S. §§ 2307, 2308.

2. Section 2323(a)(2) of the Game Code provides that "[i]n any year in which the commission establishes check stations, each person shall, within 24 hours after killing any big

game, present the big game for examination and tagging." 34 Pa.C.S. § 2323(a)(2). In turn, Section 102 of the Game Code defines "big game" as "[i]nclud[ing] the elk, the whi-

the Game Commission station in Dallas, Pennsylvania, for examination. Later that day, the Game Commission received a tip that Russo's hunting camp was "baited" in violation of Section 2308(a)(8) of the Game Code.[3] The information was relayed to Wildlife Conservation Officer (WCO) Wasserman, who then asked Deputy WCO Pierce to go to Russo's camp to investigate.[4]

Deputy WCO Pierce went to Russo's camp at approximately 6:30 p.m., and no other person was present. All of Russo's land was clearly marked with "No Trespassing" signs. Deputy WCO Pierce walked up the driveway, a distance of 600 feet, and arrived at Russo's hunting camp, which is not visible from the public road. He observed in plain view a pile of "apple mash"[5] measuring eight feet wide and six feet long, which was approximately 90 feet from the cabin. Deputy WCO Pierce also observed a large indentation in the pile

and a clearly identifiable bear paw print. He recovered some leaves with blood droplets at the pile.

Upon further exploration of the camp, Deputy WCO Pierce found another "apple mash" pile approximately 150 feet from the cabin, a corn feeder filled with corn, and a second pile of corn. Approximately 400 yards up a road, he found bear entrails, which revealed that the bear had recently eaten corn and mashed apples.

Deputy WCO Pierce left the camp and met WCO Wasserman. The two WCOs went to Russo's residence in Luzerne County, where they observed a dead black bear hanging from a front end loader as they pulled into Russo's driveway. (Tr. at 44.) The WCOs knocked on Russo's door and were invited in by Russo. After questioning, Russo assisted the WCOs in getting the bear off the front end loader and lowering it onto the big game carrier that

---

tetail deer, the bear and the wild turkey." 34 Pa.C.S. § 102.

**3.** Section 2308 of the Game Code provides, in pertinent part:

   **(a) General rule.**—Except as otherwise provided in this title, it is unlawful for any person to hunt or aid, abet, assist or conspire to hunt any game or wildlife through the use of:

   * * *

   (8) Any artificial or natural bait, ... grain, fruit, ... or other food as an enticement for game or wildlife, regardless of kind and quantity, or take advantage of any such area or food or bait prior to 30 days after the removal of such material and its residue. Nothing contained in this subsection shall pertain to normal or accepted farming, habitat management practices, oil and gas drilling, mining, forest management activities or other legitimate commercial or industrial practices....

   * * *

   **(c) Penalties.**—

   * * *

   (3) A violation of any other provision of this section is a summary offense of the fourth degree.

34 Pa.C.S. § 2308(a)(8), (c)(3).

**4.** Section 901 of the Game Code provides, in pertinent part:

   **(a) Powers.**—Any officer whose duty it is to enforce this title or any officer investigating any alleged violation of this title shall have the power and duty to:

   (1) Enforce all laws of this Commonwealth relating to game or wildlife....

   (2) Go upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty.

   * * *

   (8) Inspect and examine or search, at any time, without warrant, any camp, tent, cabin [or] trailer ... when the officer presents official identification to the person in charge and states the purpose of the inspection or search.

34 Pa.C.S. § 901(a)(1), (2), (8).

**5.** In its opinion, the trial court noted that " 'apple mash' is more correctly identified as pomace—that which remains after apples have been put through a cider press. It is obvious that the pomace was not a naturally occurring phenomenon and could not have come from apple trees in the area. It was obviously obtained from a cider mill." (April 22, 2004, Trial Ct. Op. at 2, n. 2.)

is attached to the WCOs' vehicle. (Tr. at 45, 49.) The WCOs took the bear as evidence. When questioned, Russo admitted that he was aware of the "bait," but asserted that the bear was not shot at the bait piles.

The following day, the WCOs returned to Russo's camp and took a number of photographs and measurements. They also found a small piece of bear tissue at the first "apple mash" pile. Further examination of the entrails revealed that the bear's stomach did not contain a bear's typical forage of acorns or beechnuts. Rather, the entrails contained mostly apples and corn. A forensic DNA analysis by the United States Wildlife Service established that all of the blood and tissue recovered by the WCOs in the course of the investigation came from the same bear.

Based upon the WCOs' investigation, Russo was charged with violating Sections 2307(a) and 2308(a)(8) of the Game Code.[6] Prior to trial on the charges, Russo filed a motion to suppress the evidence obtained by the WCOs. Russo alleged that all of the evidence seized by the officers was the fruit of an illegal search of his camp. Specifically, Russo asserted that as the officers *entered upon private property posted with No Trespassing signs* and, as they possessed neither a search warrant nor exigent circumstances justifying a warrantless search, the WCOs'

search of his camp violated his rights against unreasonable searches and seizures as guaranteed by Article 1, Section 8 of the Pennsylvania Constitution.[7] Following a hearing on March 31, 2004,[8] the trial court denied Russo's motion to suppress, convicted Russo of the charges, sentenced him to pay the costs of prosecution, ordered him to pay a fine totaling $1,000.00, and ordered him to make restitution to the Game Commission in the amount of $2,599.87. (April 22, 2004, Trial Ct. Order.) Specifically, the trial court held that "[a]n individual 'may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.'" (April 22, 2004, Trial Ct. Order) (citing *Commonwealth v. Rood*, 686 A.2d 442 (Pa.Cmwlth. 1996)). "[Here, because] the 'bait' pile nearest the cabin [was] more than 90 feet from the cabin and on a tree line," the nearest bait pile was not within the curtilage of the cabin. (April 22, 2004, Trial Ct. Op. at 5.) Moreover, the trial court stated:

[T]his court concludes that the search and seizure by the Wildlife Conservation Officers on November 25 and November 26, 2002, was neither unreasonable nor barred by Article I, Section 8 of the Constitution of Pennsylvania. Therefore, the Motion to Suppress must be denied. To rule otherwise would emasculate the enforcement of the Game

---

**6.** Section 2307 of the Game Code provides, in pertinent part:

(a) **General rule.**—It is unlawful for any person to aid, abet, attempt or conspire to hunt for or take or possess, use, transport or conceal any game or wildlife unlawfully taken ... or to hunt for, trap, take, kill, transport, conceal, possess or use any game or wildlife contrary to the provisions of this title.

\* \* \*

(e) **Penalties.**—A violation of this section relating to:

\* \* \*

(2) Elk or bear is a summary offense of the first degree.

34 Pa.C.S. § 2307(a), (e)(2).

**7.** Article 1, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

**8.** A hearing on Russo's Suppression Motion was consolidated with the trial de novo. (April 22, 2004, Trial Ct. Op. at 1.)

Code on any privately owned realty, as one would only have to post "no trespassing" signs to keep out the game wardens. Surely, the Constitutional Convention of 1968 could not have intended such an absurd result.

(*Id.*) Russo filed the instant appeal.[9]

■ Russo concedes that such a search was not barred by the Fourth Amendment to the United States Constitution. *See Oliver v. United States,* 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (reasoning that because open fields are accessible to the public and police in ways that a home, office or commercial structure would not be, and because fences or "No Trespassing" signs do not effectively bar the public from viewing open fields, the asserted expectation of privacy in open fields is not one that society recognizes as reasonable and the special protection accorded by the Fourth Amendment to people in their "persons, houses, papers, and effects" does not extend to open fields.) Instead, Russo argues that the search was prohibited under Article I, Section 8 of the Pennsylvania Constitution, because the four-pronged test under *Commonwealth v. Edmunds,* 526 Pa. 374, 586 A.2d 887 (1991), has been satisfied. The Pennsylvania Supreme Court, in *Edmunds,* articulated the pro-

cess by which state courts should analyze claims which assert that the Pennsylvania Constitution provides broader protections than those provided by the United States Constitution. In undertaking its analysis, the Court considered: 1) the text of the Pennsylvania constitutional provision; 2) the history of the provision, including Pennsylvania case law; 3) related case law from other states; and, 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Edmunds,* 526 Pa. at 390, 586 A.2d at 895.

In considering the history, Russo notes that "this constitutional provision embodies a strong notion of privacy, and has held that the section often provides greater protection than the Fourth Amendment to the United States Constitution because 'the core of its exclusionary rule is grounded in the protection of privacy while the federal exclusionary rule is grounded in deterring police misconduct.'" (Appellant Br. at 10) (citing *Commonwealth v. Hughes,* 575 Pa. 447, 463, 836 A.2d 893, 902 (2003)). Russo also notes that the Pennsylvania Supreme Court has consistently recognized that Article 1, Section 8 provides greater protection of privacy interests than the Fourth Amendment.[10]

---

**9.** As the Pennsylvania Superior Court has noted:

When reviewing a motion to suppress evidence, our scope of review is well established.

[W]e consider whether the record supports the suppression court's factual findings, and the legal conclusions drawn therefrom, by reviewing the prosecution's evidence and only so much of the defense's evidence as remains uncontradicted within the context of the record as a whole. Factual findings unsupported by the evidence may be rejected, but if the record supports the suppression court's factual findings, reversal of a suppression court's actions is justified only if the inferences and legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Hannon,* 837 A.2d 551, 553 (Pa.Super.2003), *petition for allowance of appeal denied,* 577 Pa. 711, 847 A.2d 1279 (2004) (citation omitted).

**10.** *See, e.g.,* the following cases cited by Russo for this proposition: *Commonwealth v. Shaw,* 564 Pa. 617, 770 A.2d 295 (2001); *Commonwealth v. White,* 543 Pa. 45, 669 A.2d 896 (1995); *Commonwealth v. Mason,* 535 Pa. 560, 637 A.2d 251 (1993); *Commonwealth v. Kohl,* 532 Pa. 152, 615 A.2d 308 (1992); *Commonwealth v. Rodriquez,* 532 Pa. 62, 614 A.2d 1378 (1992); *Commonwealth v. Chambers,* 528 Pa. 403, 598 A.2d 539 (1991); *Edmunds,* 526 Pa. 374, 586 A.2d 887.

Further, he observes that a number of other jurisdictions have recognized that a non-consensual or warrantless search of posted property violates similar constitutional provisions in those states.[11] Russo also contends that strong public policy militates against such unreasonable searches of posted private property in light of Pennsylvania's long recognition of the sanctity of private property, its criminal laws prohibiting trespass, and avoidance of confrontations between landowners and WCOs. Russo also relies on an unreported opinion of the Court of Common Pleas of Clinton County.[12]

As Russo's citations indicate, the courts have delineated clear lines of distinction between the state and federal constitutions when applying Article I, Section 8 of the Pennsylvania Constitution in state criminal proceedings, and the Pennsylvania courts have established an interpretation of Section 8 that grants greater privacy rights than its federal counterpart. However, even with Pennsylvania's greater protection of citizens' privacy, we cannot agree with Russo's argument that his constitutional rights were violated in this case.

The crux of Russo's argument is that because he had posted "No Trespassing" signs that were clear and visible to anyone approaching his property, he had a reasonable expectation of privacy in the wooded area surrounding his hunting camp. Moreover, he argues that this expectation

reasonably extended to privacy from game officers.

Because Russo's argument is premised upon the fact that he posted his property with "No Trespassing" signs, we first look at the law that defines "trespass." A person commits the offense of "criminal trespass" **"if, knowing that he is not licensed or privileged to do so,** he enters or remains in any place as to which notice against trespass is given by: . . . (ii) posting in a manner prescribed by law or reasonably likely to come to the attention of intruders." 18 Pa.C.S. § 3503(b)(1)(ii) (emphasis added). The law permits a property owner to post his land with notice in an attempt to exclude trespassers, but also carves out an exception for a person who is licensed or privileged to enter such property. Pursuant to the Game Code, an officer is privileged and empowered to "[e]nforce all laws of this Commonwealth relating to game or wildlife and arrest any person who has violated any of the provisions of this title while in pursuit of that person immediately following the violation." 34 Pa.C.S. § 901(a)(1). Moreover, an officer is empowered to "[g]o upon any land or water outside of buildings, **posted or otherwise,** in the performance of the officer's duty." 34 Pa.C.S. § 901(a)(2) (emphasis added). *See also Rood.* Thus, when we closely examine the law of trespass, we find an *exception* to the power of posted signs, which exception includes

---

11. *See, e.g.,* the following cases cited by Russo for this proposition: *Falkner v. State,* 134 Miss. 253, 98 So. 691 (1924); *State v. Bullock,* 272 Mont. 361, 901 P.2d 61 (1995); *People v. Scott,* 79 N.Y.2d 474, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (1992); *State v. Dixson,* 307 Or. 195, 766 P.2d 1015 (1988); *State v. Kirchoff,* 156 Vt. 1, 587 A.2d 988 (1991); *State v. Johnson,* 75 Wash.App. 692, 879 P.2d 984 (1994), *petition for review denied,* 126 Wash.2d 1004, 891 P.2d 38 (1995).

12. In *Commonwealth v. Edwards et al.,* (Clinton County C.C.P., Nos. 220–03 CR, 221–03

CR, 222–03 CR, 223–03 CR, 224–03 CR, and 225–03 CR, filed September 3, 2003), common pleas held that a landowner who has posted "No Trespassing" signs had a protected privacy interest under Article 1, Section 8 of the Pennsylvania Constitution, in open fields which are not in open view to anyone on surrounding land. This case is currently pending before the Pennsylvania Supreme Court. In October 2004, the Supreme Court granted the parties permission to present oral argument (246–249 MAP 2003).

game officers when performing their duty. Here, the signs, while legally placed by Russo in an attempt to keep unwelcome and unlawful trespassers off his property, do not negate a game officer's right and authority to investigate a crime scene relating to game or wildlife. Thus, Russo's posting of the signs cannot form the basis of a reasonable expectation of privacy; it would be unreasonable for him to expect that game officers, who are privileged to enter the land, would not do so to assure compliance with the Game Law. *See also Rood*, 686 A.2d at 450 (holding that a game officer was "statutorily authorized to venture out into the field and wooded areas located on Rood's property in search of the man reportedly hunting illegally thereon" pursuant to Section 741, which entitled officers to "[g]o upon any land or water outside of buildings, posted or otherwise, in the performance of the officer's duty.") Indeed, we agree with the trial court that if Russo's position were the law in our Commonwealth, criminals could very easily carry on illegal enterprises by merely placing "No Trespassing" signs around the perimeter of their property.[13]

Accordingly, we must affirm the order of the trial court.

### ORDER

NOW, January 7, 2005, the order of the Criminal Division of the Court of Common Pleas of the 44th Judicial District, Wyoming County Branch, in the above-captioned matter, is hereby affirmed.

---

**13.** The Commonwealth's position relies on Pennsylvania's adoption of the "open field" exception to the warrant requirement as enunciated in *Oliver*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214; *see also Commonwealth v. Beals*, 313 Pa.Super. 346, 459 A.2d 1263 (1983). Because the apple mash piles, the bloody leaves and muscle tissue were found in the open area, the Commonwealth asserts that they were not subject to suppression by the trial court. Moreover, it argues that even if it is assumed that the apple mash piles, the bloody leaves and the muscle tissue were found within the "curtilage" of Russo's hunting cabin, the WCOs conducted a proper search of this area because it was based upon reasonable suspicion that a violation of the Game Code had occurred. *See Commonwealth v. Carelli*, 377 Pa.Super. 117, 546 A.2d 1185 (1988), *petition for allowance of appeal denied*, 521 Pa. 609, 557 A.2d 341 (1989); *Commonwealth v. Cihylik*, 337 Pa.Super. 221, 486 A.2d 987 (1985). Because of our holding in this case, we need not address this argument.