Gus MACAULY, Jr., Appellant,

v.

STATE of Alaska, Appellee.

No. A–946.

Court of Appeals of Alaska.

April 3, 1987.

Susan Orlansky, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Robert D. Bacon, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

BRYNER, Chief Judge.

Gus Macauly, Jr., was convicted by a jury of manslaughter. Superior Court Judge Beverly W. Cutler sentenced Macauly to a presumptive term of five years. Macauly appeals, contending that the superior court erred in failing to suppress evidence of an involuntary confession and in instructing the jury that intoxication could be inferred from a blood alcohol content of .10 percent or greater. Macauly also challenges his sentence, asserting that the court erred in rejecting the claim that his conduct was among the least serious within the definition of manslaughter. We affirm.

On June 8, 1984, a car occupied by Macauly and Kenneth Paneok fishtailed out of control while traveling south along the Glenn Highway between Wasilla and Palmer. After running onto the right shoulder of the road, the car swerved suddenly across the centerline and struck a tow truck head-on. Paneok was killed instantly; Macauly suffered serious injuries and was taken to the Valley Hospital in Palmer.

Hospital personnel detected a strong odor of alcohol about Macauly and ordered a blood alcohol test for medical purposes less than an hour after the accident. The test revealed a blood alcohol content of .152 percent. One hour later, at the request of the Alaska State Troopers, a second blood sample was taken from Macauly for alcohol testing. The sample was tested at the crime lab in Anchorage several days later and yielded a blood alcohol content of .123 percent. Because of the severity of his injuries, Macauly was transferred to Providence Hospital in Anchorage. There, another blood alcohol test was performed for medical purposes. The test, conducted approximately five hours after the accident, disclosed a blood alcohol content of .063 percent. Several days later, Macauly was again transferred, this time to the Alaska Native Service Hospital (ANS), where he remained until his release on July 9, 1984.

As a result of the collision Macauly suffered two broken vertebrae and serious head injuries. He was placed in a neck brace, and later in a halo cast. Macauly remained in a coma for several days, regaining consciousness gradually over a period of about one week. After regaining consciousness, Macauly was subject to periods of incoherence and extremely irrational behavior. He shouted violently and inappropriately at nurses and had to be physically restrained to prevent him from attempting to remove his brace or get out of bed.

These outbursts were interspersed with calmer periods, when Macauly seemed fully oriented and behaved rationally. Even after his condition improved, however, Macauly was loosely restrained in bed at night as a precautionary measure, and so that he would not attempt to get out of bed without calling for assistance. Prior to being discharged, Macauly was able to learn to walk with a cane and was capable of feeding himself some of the time.

Two to three weeks after the accident, Alaska State Trooper Douglas Huntsman visited ANS hospital to check on Macauly's condition. He was told by a nurse that Macauly was talkative and coherent.

Huntsman entered Macauly's room to talk with him, but found Macauly staring at the ceiling and unresponsive. Huntsman left.

On July 6, 1984, approximately two weeks after his initial visit and three days before Macauly's eventual release, Huntsman, accompanied by Trooper Richard Terry, again visited ANS. Again, a nurse told Huntsman that Macauly was talkative and coherent. The nurse entered Macauly's room and asked if Macauly would be willing to speak to the troopers. Macauly said that he would. Huntsman and Terry entered the room, and Huntsman spoke with Macauly about the accident for approximately ten to fifteen minutes.

Huntsman did not advise Macauly of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), apparently because he did not consider the interrogation custodial. During a portion of the interview, the nurse remained in the room; Macauly's grandmother, who was already there when Huntsman and Terry arrived, remained in the room throughout the interview.

In speaking with Huntsman, Macauly repeatedly expressed remorse over the accident. He said that there was nothing mechanically wrong with his car and attributed the accident to his drinking. Macauly acknowledged that he, not Paneok, had been driving. According to both troopers, Macauly appeared to be fully alert, coherent and rational. He showed no signs of pain or discomfort, and he did not display any indication of being under the influence of medication. Neither trooper saw any physical restraints.

Nevertheless, a portion of Macauly's statement to Huntsman did indicate the possibility of confusion on Macauly's part. When asked where he was coming from at the time of the collision, Macauly said Ninilchik. The response was implausible, because Macauly had in fact been driving south from Wasilla toward Anchorage, the wrong direction to be coming from Ninilchik. Huntsman asked what Macauly had been doing, and Macauly replied that he had been fishing. When asked why no fishing poles had been found, Macauly said he had hidden them behind some trees. These answers made little sense, in context, but Huntsman elected not to pursue them.

Upon completion of the interview, the troopers left the hospital. Macauly was discharged three days later. He was driven home from the hospital by a sister. According to Macauly's sister, although Macauly appeared rational and coherent, he seemed to have no memory of the accident and did not understand that his own car had been destroyed. Macauly appeared to confuse the accident with an accident that he had a year previously. Macauly's testimony indicated that he had no recollection of the events surrounding the fatal collision. Macauly remembered speaking to the troopers, but did not recall what he had said.

Based in part on his statement to the troopers, Macauly was indicted for manslaughter about two weeks after his release from the hospital. Prior to trial he moved to suppress his statement, alleging that it had been obtained in violation of his *Miranda* rights and was involuntary. Following an evidentiary hearing, Judge Cutler found that no *Miranda* violation had occurred because Macauly was not in custody when interviewed. The judge also upheld the voluntariness of Macauly's confession, finding an absence of coercive conduct by the troopers. Macauly's statement was subsequently admitted against him at trial.

On appeal, Macauly does not press the *Miranda* claim he advanced below. He relies instead on the assertion that his confession was involuntary. The guidelines for consideration of this issue are well settled:

> When an appellate court reviews a trial judge's determination of voluntariness, its standard of review reflects the mixed factual and legal nature of the voluntariness inquiry. The voluntariness inquiry involves three steps. First, the trial judge must find the external, phenomenological facts surrounding the confession. Second, from these external facts, the judge must infer an internal psycho-

logical fact: the mental state of the accused. Finally, the judge must assess the legal significance of this inferred mental state.

The first step of the inquiry, determining historical fact, is a pure fact-finding task requiring weighing the credibility of witnesses. Therefore, the appellate court must defer to a trial judge's findings of historical fact and overturn them only if they are clearly erroneous. However, the appellate court has a duty to examine the entire record and make its own independent determinations as to the mental state of the accused and its legal significance. These determinations are to be based on the totality of the circumstances surrounding the confession.

*State v. Ridgely,* 732 P.2d 550, 554 (Alaska 1987) (citations omitted). *See also Ladd v. State,* 568 P.2d 960, 967 (Alaska 1977), *cert. denied,* 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978); *Johnson v. State,* 631 P.2d 508, 512 (Alaska App.1981).

The historical facts in this case are for the most part undisputed. At issue is the significance of Judge Cutler's finding that Macauly's statement was not the product of duress or coercion by the troopers. Macauly does not challenge Judge Cutler's finding that there was no coercive police conduct. Rather, Macauly's argument is that coercion is not determinative of the voluntariness issue; he insists that a confession is rendered involuntary, and therefore inadmissible, when any event or condition, regardless of its source, overbears the accused's rational mind and free will. Macauly thus asserts that his statement to the troopers was involuntary because of his impaired mental condition following the collision.

■ We believe this argument must be rejected. Despite earlier cases that appear

to give strong support to Macauly's argument,[1] the United States Supreme Court has now squarely ruled that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly,* —— U.S. ——, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Since Judge Cutler's factual determination that Troopers Huntsman and Terry engaged in no coercive activity is not clearly erroneous, *Connelly* appears to be dispositive of Macauly's voluntariness claim.[2]

■ Even assuming *Connelly* were not dispositive, we would find little merit to Macauly's argument. Review of the record shows that, as Macauly's physical health improved in the weeks following the collision, his episodes of irrational behavior subsided; he was better able to understand what was going on about him and became increasingly aware of his relationship to those around him. The challenged interview occurred a full month after the collision. Macauly was described by a nurse as being talkative and coherent. He was asked by the nurse if he would be willing to speak with the officers, and he readily agreed to do so. Neither trooper noted any overt signs of impairment.

Although Macauly's movements were severely restricted by his halo cast, it is undisputed that he was ambulatory when interviewed. By his own account, "I could have got up and left the room, but I didn't. ..." While giving some indication of confusion and impaired memory, Macauly's answers to the questions posed by Trooper Huntsman were generally appropriate, responsive and rational.

■ Macauly suggests that his statement that he was coming from Ninilchik when the collision occurred indicates that

---

**1.** *See Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

**2.** Macauly has not advanced an argument specifically based on the Alaska Constitution. In light of our alternative conclusion that Macau-

ly's confession would be voluntary even if coercive activity on the part of the police were not required, we have no occasion here to consider whether greater protection might be afforded under the Alaska Constitution's due process clause (Alaska Const., art. I, § 7) than under the federal constitution.

he was confusing the fatal case with an accident he had been involved in during the previous year. Yet this does not appear to be correct. Macauly was not traveling from Ninilchik when the prior accident occurred. Moreover, in speaking with Macauly, Trooper Huntsman made it clear that he was asking questions about an accident involving Paneok; Macauly appeared to understand this. Paneok had not been involved in the prior accident. Finally, Macauly's ready admission of drinking before the collision appears inconsistent with the prior accident, since he had apparently not been drinking before that accident.

■ Macauly additionally asserts that his mental state was impaired as a result of powerful prescription drugs that he was receiving in the hospital. Specifically, he asserts that he had been given prescription Tylenol for pain, as well as Haldol, a tranquilizer. A close examination of the record, however, seems to refute this assertion. Macauly's interview occurred around mid-day on July 6. Both troopers testified that Macauly appeared to be alert and showed no signs of being under the influence of medication. Hospital records for July 6 establish that Macauly had received a dose of Tylenol at approximately 1:00 a.m., about eleven hours before the interview. He was not given Haldol until 9:30 p.m., well after the interview had concluded. It appears that Macauly's most recent prior dose of Haldol was administered on June 28. In short, we find no persuasive indication that Macauly's thinking was impaired by the use of any medication. *See Mallott v. State,* 608 P.2d 737, 743 (Alaska 1980); *People v. Kincaid,* 429 N.E.2d 508, 509–13 (Ill.1981), *cert. denied,* 455 U.S. 1024, 102 S.Ct. 1726, 72 L.Ed.2d 144 (1982).

By all accounts, Macauly had some difficulty organizing his past experiences and relating them to the present. Throughout his hospitalization, and even at the time of his trial, Macauly did not appear to have a coherent understanding of the accident.

Yet, in our view, the fact that Macauly suffered some impairment of his memory is insufficient to cast doubt upon his mental competence at the time of the interview. Despite the severe trauma he had suffered, Macauly appears to have been capable of understanding his situation at the time of the interview and of making a rational and voluntary decision to speak with the troopers.

The cases relied on by Macauly are readily distinguishable in this regard. In *Mincey v. Arizona,* 437 U.S. 385, 396–402, 98 S.Ct. 2408, 2415–18, 57 L.Ed.2d 290 (1978), for example, the accused was questioned in the intensive care unit of a hospital a few hours after being shot, and while he was "depressed almost to the point of coma." *Id.* at 398, 98 S.Ct. at 2416. Police in *Townsend v. Sain,* 372 U.S. 293, 297–99, 83 S.Ct. 745, 749–50, 9 L.Ed.2d 770 (1963), interrogated the accused when he was withdrawing from heroin, and after administering him a drug that acted as a truth serum. And, in *Blackburn v. Alabama,* 361 U.S. 199, 204–05, 80 S.Ct. 274, 278–79, 4 L.Ed.2d 242 (1960), a legally insane suspect was interrogated for nine hours in a small room, and his confession was composed by a deputy sheriff.[3]

■ In each of these cases the record irrefutably demonstrated significant impairment of the accused's present ability to make rational decisions concerning his circumstances. In contrast, although Macauly's mental condition may have raised questions about the accuracy of his memory, he appears to have been rational and coherent when interviewed. The issue of accuracy is primarily one for the jury to decide at trial, rather than for the court to consider in assessing voluntariness. *See Colorado v. Connelly,* —— U.S. ——, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). Based on our independent review of the record, we find ample support for the conclusion that Macauly's memory loss did not significantly

---

**3.** To the same effect, *see DeConingh v. State,* 433 So.2d 501 (Fla.1983), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984) (questioning occurred two days after suspect's hospitalization for severe depression and while suspect being treated with Thorazine and Valium); *State v. Mikulewicz,* 462 A.2d 497 (Me.1983) (intoxicated suspect permitted to continue drinking heavily during a seven-hour interrogation).

interfere with his ability to act with a "rational mind and free will" in deciding to talk with the troopers.[4] *Stobaugh v. State,* 614 P.2d 767, 771 (Alaska 1980). We hold that Macauly's confession was voluntary.

Macauly next contends that the trial court erred in instructing the jury that Macauly's intoxication could be inferred from his blood test results. At trial, the state offered evidence concerning the results of the three blood alcohol tests that were administered on the night of the collision. The first and third tests were administered for medical purposes; analyses of the blood samples drawn for these tests were performed by hospital personnel, who did not follow state regulations governing blood alcohol analysis for forensic use. *See* AS 28.35.033(d), and its implementing regulation, 7 Alaska Administrative Code (AAC) 30.100. The second blood sample drawn from Macauly, which disclosed a blood alcohol content of .123 percent, was taken at the request of the Alaska State Troopers. Efforts were made to comply with the applicable state statute and regulation during the testing of this sample, which was referred to at Macauly's trial as the "legal" sample.

The results of all three blood tests were admitted at trial without objection. After the close of the evidence, however, Macauly objected to the giving of an instruction concerning the "legal" blood sample. The instruction permitted the jury to infer intoxication from a blood test result of .10 percent or greater. In relevant part, the instruction stated:

> Under Alaska law, when a person is alleged to be operating a motor vehicle under the influence of intoxicating liquor, the amount of alcohol in the person's blood at the time alleged, as shown by a "legal" test of the person's blood, may give rise to the following inferences:
>
> If you find that a blood analysis accurately established a defendant's blood alcohol content to be one-tenth of one percent (.10%) or greater, and if you find no other believable evidence of his condition, then you may rely solely on the test as a basis for finding that the defendant was under the influence of intoxicating liquor at the time charged.

This instruction tracks the statutory presumption of intoxication created under AS 28.35.033(a),[5] and is routinely given in cases involving allegations of drunken driving. Macauly objected to it on foundational

---

4. In fact, Macauly's trial counsel apparently recognized the voluntariness of Macauly's statement to the troopers. Although Macauly initially based his suppression motion on both an alleged *Miranda* violation and a claim of involuntariness, his trial counsel argued only the *Miranda* issue at the evidentiary hearing, representing that "[t]he only issue is whether the situation was custodial in nature...." In arguing the *Miranda* violation, trial counsel stated, in part, "[t]he police officer knew that Macauly had been in and out of his right mind. He found the defendant in his right mind momentarily. And took 15 minutes and nailed down all 4 corners of the case."

5. AS 28.35.033 provides in relevant part:
   *Chemical analysis of blood.* (a) Upon the trial of a civil or criminal action or proceeding arising out of acts alleged to have been committed by a person while operating or driving a motor vehicle or operating an aircraft or a watercraft while intoxicated, the amount of alcohol in the person's blood or breath at the time alleged shall give rise to the following presumptions:
   ....
   (4) If there was 0.10 percent or more by weight of alcohol in the person's blood, or 100

milligrams or more of alcohol per 100 milliliters of the person's blood, or 0.10 grams or more of alcohol per 210 liters of the person's breath, it shall be presumed that the person was under the influence of intoxicating liquor.
   ....
   (d) To be considered valid under the provisions of this section the chemical analysis of the person's breath or blood shall have been performed according to methods approved by the Department of Health and Social Services. The Department of Health and Social Services is authorized to approve satisfactory techniques, methods, and standards of training necessary to ascertain the qualifications of individuals to conduct the analysis. If it is established at trial that a chemical analysis of breath or blood was performed according to approved methods by a person trained according to techniques, methods and standards of training approved by the Department of Health and Social Services, there is a presumption that the test results are valid and further foundation for introduction of the evidence is unnecessary.

grounds, arguing for the first time that the state had failed to establish compliance with the methods specified in 7 AAC 30.100 for the handling of blood test samples.

Macauly's objection was overruled by Judge Cutler, who found that the state had established substantial compliance with the procedures specified in the regulation. Judge Cutler also found that, to the extent substantial compliance was not shown, Macauly had waived the issue by failing to object to the admission of the blood test evidence at trial. Macauly now challenges Judge Cutler's ruling.

█ Macauly first argues that strict compliance with the methods prescribed for the handling and analysis of blood alcohol samples should be required. He reasons that, while substantial compliance may suffice to allow admission of blood test results, strict compliance should be required before the statutory presumption of intoxication applies. In advancing this argument, Macauly recognizes that Alaska has previously adopted a standard of substantial compliance for both the admission of blood test results and application of the statutory presumption of intoxication. *See, e.g., Wester v. State,* 528 P.2d 1179, 1184–85 (Alaska 1974), *cert. denied,* 423 U.S. 386, 96 S.Ct. 60, 46 L.Ed.2d 54 (1975); *Herter v. State,* 715 P.2d 274, 276 (Alaska App.1986). Nevertheless, Macauly urges us to rethink the rulings in which we have adopted substantial compliance as the rule governing applicability of the statutory presumption. *See Herter,* 715 P.2d at 276; *Kalmakoff v. Anchorage,* 715 P.2d 261, 263 & n. 3 (Alaska App.1986). We find no persuasive basis for reconsidering these precedents, however, and decline to do so.

Macauly alternatively contests Judge Cutler's finding of substantial compliance with 7 AAC 30.100. In particular, he alleges that his blood sample was left unrefrigerated for a day or two prior to being shipped from Palmer to Anchorage. Refrigeration is required by 7 AAC 30.100(7). According to Macauly, the trial record is, at best, silent on the issue of whether his sample was refrigerated. Although he failed to object to the foundation laid by the state before the blood test result was admitted and raised the issue for the first time after the close of the evidence, Macauly asserts that "the state is stuck with the record from the trial court." Macauly reasons that, since the state bears the burden of establishing substantial compliance, an instruction on the presumption of intoxication was improper.

█ We find, however, that the trial court's substantial compliance finding is not clearly erroneous. Although the record is inadequate to determine whether the "legal" sample of Macauly's blood was refrigerated in compliance with 7 AAC 30.-100(7), there is sufficient evidence to support the conclusion that the sample was treated with a preservative, as required under 7 AAC 30.100(6). The laboratory technician who drew Macauly's blood testified that the difference between handling a "legal" blood sample, and a "medical" sample, is that the legal sample is drawn into a special tube that contains preservatives. As acknowledged in the treatise relied on by Macauly on appeal, preservatives and refrigeration accomplish the same basic purpose:

> The process of decomposition [of blood alcohol] is retarded by refrigeration; it may be entirely eliminated by using a preservative.

1 R. Erwin, *Defense of Drunk Driving Cases* § 17.07 at 17–68 (3rd ed. 1987).

█ Moreover, to the extent that the record is inconclusive as to the state's substantial compliance with 7 AAC 30.100, it seems to us that the trial court was correct in finding that Macauly's failure to object to the admission of the blood test results precludes him from asserting the deficiency as a basis for his claim of error. The foundational requirements of AS 28.35.-033(d) apply equally to the admission of blood alcohol evidence and to the application of the statutory presumption of intoxication. While the distinction between the admission of evidence and the application of the statutory presumption may present analytically separate questions, we are aware of no justification for allowing counsel to wait until after the close of evidence

at trial before raising the issue of substantial compliance. Such a rule would serve only to promote procedural artifice: the defense would be permitted, for strategic purposes, to bypass a foundational objection to admission of blood test evidence, only to raise the issue for the first time after the close of the evidence, when it could argue that the prosecution was "stuck with" the record already created. We hold that, at least in the absence of a specific reservation of the issue during the course of trial, a party failing to object on foundational grounds to admission of blood- or breath-alcohol test results cannot later object to the application of the statutory presumption of intoxication.

Macauly's final challenge on appeal is to his sentence. Below, Macauly alleged the applicability of one statutory mitigating factor: that his conduct was among the least serious within the definition of manslaughter. AS 12.55.155(d)(9). Judge Cutler rejected this factor, concluding that Macauly's crime was relatively characteristic of drunken driving manslaughter offenses. The judge sentenced Macauly to the applicable presumptive term of five years. Macauly argues that rejection of his proposed mitigating factor amounted to error.

Statutory mitigating factors must be established by clear and convincing evidence. AS 12.55.155(f). The sentencing court's decision on the issue is subject to reversal only if clearly erroneous. *Walsh v. State*, 677 P.2d 912, 916 (Alaska App.1984); *Juneby v. State*, 641 P.2d 823, 834 (Alaska App. 1982), *modified on other grounds*, 665 P.2d 30 (Alaska App.1983).

While the evidence in this case certainly does not establish an aggravated act of manslaughter, neither does it convincingly demonstrate conduct among the least serious for the offense. Macauly's blood alcohol level, while not astronomically high, was far from borderline; it was well above the statutory minimum, thus indicating a significant level of impairment. There is no evidence of egregious acts of driving that would independently amount to recklessness. Yet, this is clearly not a case of driving that was unusually safe for a manslaughter case. Macauly lost control of his car in the face of oncoming traffic on a highway. The only explanation other than his intoxication is the fact that the pavement was damp—a condition that typically poses no difficulty to ordinary, unimpaired motorists. Although Macauly was a youthful first offender with no significant substance abuse problem, his prior traffic record is not insignificant, and includes a conviction for driving while his license was suspended.

We conclude, on balance, that Judge Cutler's rejection of the proposed mitigating factor was not clearly erroneous. Having independently reviewed the entire sentencing record, we further conclude that the five-year sentence Macauly received was not clearly mistaken. *McClain v. State*, 519 P.2d 811, 813–14 (Alaska 1974).

The conviction and sentence are AFFIRMED.