**STATE of Alaska, Appellant,**

v.

**Peter A. SCHWIN, Appellee.**

**No. A–5925.**

Court of Appeals of Alaska.

May 30, 1997.

Eric A. Johnson, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Margi Mock, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

### OPINION

BRYNER, Chief Judge.

In November 1992, an Alaska grand jury charged Peter A. Schwin with first-degree murder, robbery, and various other crimes stemming from a drug related homicide committed in January 1991. Schwin moved to dismiss, claiming that his state prosecution was barred by a federal grant of use and derivative use immunity he received in April 1992, when he was compelled to testify in a federal drug conspiracy prosecution arising from the January 1991 homicide. Following an evidentiary hearing, Superior Court Judge Karen L. Hunt found Schwin's prosecution barred by Alaska's constitutional guarantee against compulsory self-incrimination. Alaska Const. art. I, § 9. Accordingly, Judge Hunt dismissed Schwin's charges. The state appeals the superior court's dismissal order. We reverse.

On January 22, 1991, the Anchorage Police Department began investigating the recent disappearance of William E. Koch. Early on, it became clear that Koch had likely been the victim of a homicide arising from a cocaine transaction involving seven or eight conspirators. Suspicion focused on two members of the conspiracy as the persons responsible for the homicide: Peter Schwin and Tim Donnelly.

The Alaska State Troopers soon joined the Anchorage Police Department in investigating the case; the Federal Bureau of Investigation also began to participate; and ultimately, the investigation took shape as a federal-state task force headed by prosecutors from the offices of the Anchorage District Attorney and the Alaska United States Attorney. By June 1991, Schwin had confessed to a federal investigator that he and Donnelly had murdered Koch. Schwin's description of the murder, and a map he drew for the investigator, led to the discovery of Koch's body.

Even before this, state and federal prosecutors had determined to focus initially on developing and prosecuting federal drug conspiracy charges, then on pursuing state homicide charges.[1] A federal grand jury convened on the case in October 1991 and indicted Schwin and Donnelly on conspiracy charges on January 28, 1992. An attorney was appointed to represent Schwin on the federal charge; by March 1, 1992, Schwin had entered into a plea bargain with the United States Attorney's office.

Under the terms of the bargain, the government promised certain sentencing concessions in return for Schwin's plea of guilty to the federal conspiracy charge and his agreement to testify truthfully against his codefendant, Donnelly. At Schwin's insistence, the plea agreement included a provision stipulating that his testimony against Donnelly would be compelled by a formal grant of use and derivative use immunity.[2]

Donnelly stood trial in federal district court in April 1992. Schwin appeared as a prosecution witness; after invoking his privilege against self-incrimination, he was formally granted use and derivative use immunity, and, in accordance with 18 U.S.C. § 6002, the court ordered him to testify.[3] Schwin testified pursuant to that order.

---

**1.** As reflected in a prosecution exhibit entitled "The Peter Schwin Chronology," the task force decided that "[o]nce Schwin confesses to the murder and Koch's body is located, it then is agreed that the U.S. Attorney's Office will first prosecute the drug conspiracy case to be followed by the State homicide prosecution."

**2.** The plea agreement stated, in relevant part:
*MUTUAL AGREEMENTS*
The parties agree as follows:
A. It is the contemplation of both parties that as part of this plea agreement, Peter

Schwin shall be compelled to provide complete and truthful testimony in [Donnelly's case] pursuant to an immunity order under 18 U.S.C. § 6002.

**3.** 18 U.S.C. § 6002 (1994) states in pertinent part:

Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—(1) a court or grand jury of the United States, ... and the person

Seven months later, in November 1992, the state indicted Schwin for murder, robbery, and related charges arising from the Koch homicide. Schwin moved to dismiss the charges, claiming that they were barred by his federal immunity grant.

Schwin based his motion to dismiss primarily on *State v. Gonzalez*, 853 P.2d 526 (Alaska 1993), in which the Alaska Supreme Court interpreted the Alaska Constitution's privilege against self-incrimination to require that transactional immunity be given before the state can compel an unwilling witness to testify. In *Gonzalez*, the court expressed "doubt that workaday measures can, *in practice*, protect adequately against use and derivative use" of the compelled testimony, *id.* at 530 (emphasis in original), and concluded that use and derivative use immunity "cannot meaningfully safeguard against nonevidentiary use of compelled testimony." *Id.* at 531.[4]

In moving to dismiss, Schwin argued that, under *Gonzalez*, the federal immunity he had been given to testify against Donnelly should be treated as a grant of transactional immunity, since only transactional immunity could shelter him from the dangers of nonevidentiary use of his testimony.

Upon a preliminary consideration of Schwin's motion, the superior court decided that the Alaska Constitution applies in a limited number of cases involving grants of immunity by other jurisdictions—"only in those cases where the degree of cooperation between the two jurisdictions creates risks similar to [the risks of nonevidentiary use] outlined by the *Gonzalez* court." According to the superior court, "[u]nder this approach, the nature and scope of the interjurisdictional investigative contacts regarding an individ-

ual who was compelled to testify in the other jurisdiction would determine whether that individual would be entitled to transactional immunity in a subsequent Alaska prosecution."

By way of clarification, the superior court explained:

> Where the state's contacts with the compelling jurisdiction are limited and at arms-length, the policy concerns of *Gonzalez* are not implicated and an individual's right against self-incrimination is adequately protected by use/derivative use immunity. Where the state's contacts with the compelling jurisdiction are more substantial, the concerns outlined by *Gonzalez* can only be addressed by affording an individual transactional immunity from state prosecution.

The superior court took pains to distinguish this inquiry into interjurisdictional contacts from a "taint" hearing of the kind traditionally held in cases involving use and derivative use immunity:

> Unlike a *Kastigar/Murphy*[5] taint hearing, such a hearing would focus on the nature and scope of interaction between the two jurisdictions rather than on the source of the prosecuting state's evidence. In the course of such a hearing, the state would have to reveal, *inter alia*, the nature and scope of its joint activities, the identities of those participating, the number of meetings and/or other contacts, and the documents prepared and/or shared in the course of these activities.

The superior court went on to find that the burden of proving the nature of the interjurisdictional investigative contacts in any given case properly belonged to the state, and

presiding over the proceeding communicates to the witness an order issued under this title, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

**4.** Nonevidentiary use, which in *Gonzalez* the state conceded is prohibited under the Alaska

Constitution, " 'include[s] assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy.' " *Gonzalez*, 853 P.2d at 531–32 (quoting *United States v. McDaniel*, 482 F.2d 305, 311 (8th Cir.1973)).

**5.** *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972); *Murphy v. Waterfront Comm'n of New York Harbor*, 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964).

so ordered an evidentiary hearing at which the state was required "to establish by a preponderance of the evidence that its investigatory relationship with federal authorities did not compromise the defendant's right against self-incrimination."

Following an extensive evidentiary hearing into the state/federal investigation in Schwin's case, the superior court found that "the contacts between state and federal prosecutors, between state and federal investigators, and between state prosecutors and federal investigators were too numerous and too extensive for the higher constitutional protection of *Gonzalez* not to apply."

The court made clear that it based this finding "especially . . . on the nature and extent of the interactions between the state and federal authorities after it became known that defendant was going to be compelled to testify and was going to be given immunity for his testimony." After considering and rejecting a number of legal arguments advanced by the state, the superior court concluded that, under *Gonzalez*, Schwin was entitled to transactional immuni-

ty and that dismissal of Schwin's charges was therefore required.[6]

The state then filed this appeal. On appeal, the state renews the legal arguments it advanced below: that Schwin's case should be governed by the federal grant of use and derivative use he was actually given, that this level of immunity is adequate to protect Schwin's privilege against self-incrimination, that Schwin's federal testimony was not actually compelled, and that he has forfeited his right to claim anything more than he was expressly promised. In short, the state insists that the Alaska Constitution's guarantee of transactional immunity does not extend to Schwin's federal testimony.[7]

In response, Schwin emphasizes the limited scope of his argument: he does not, strictly speaking, contend that the Alaska Constitution actually required that he be given transactional immunity instead of use and derivative use immunity in return for his federal testimony; rather, according to Schwin, *Gonzalez* establishes that he can never adequately be protected from nonevidentiary use of his compelled federal testimony, and so, to meet the demands of the

---

6. In reaching this conclusion, the superior court again stressed that its decision was based on post-immunity state/federal contacts, that none of the pre- or post-immunity contacts had been *per se* impermissible or made in bad faith, and that no proof of evidentiary taint had been established:

In this case state and federal law enforcement officials jointly investigated the circumstances surrounding the death of Koch. State and federal prosecutors worked together during the investigation. These co-operative efforts were permissible. However, once the defendant testified in federal court, under the Alaska [C]onstitution as set forth in *Gonzalez*, the state prosecutors meeting with the federal prosecutors to learn their theme of the federal case, their trial tactics, and their evaluation of whether witnesses were good or bad for the prosecution was not permissible. Even though the content of defendant's federal testimony was kept from the state prosecutors, they were exposed to the nonevidentiary uses of his testimony. Under *Gonzalez*, 853 P.2d at 531–32, such exchange is constitutionally prohibited. It would not be possible for a state court to identify the nonevidentiary uses of defendant's immunized federal testimony, or to enforce a ban against such uses. As the supreme court articulated in *Gonzalez*, 853 P.2d at 530, "Even the state's utmost good faith is not an adequate

assurance against nonevidentiary uses because there may be 'nonevidentiary' uses of which even the prosecutor is not aware." (Footnote omitted.)

7. Indeed, the state maintains that, given the procedural context of Schwin's constitutional claim, this is not even an immunity case. According to the state, this is not a case in which Schwin asserts that he is entitled to transactional immunity before he can be compelled to testify; rather it is a case in which Schwin alleges a violation that has already occurred and seeks to remedy that violation after the fact. The state maintains that the notion of "transactional immunity" has no bearing in this context, and that, instead, traditional harmless error analysis applies. Our resolution of this case makes it unnecessary to consider this intriguing legal theory.

As an alternative to its various legal arguments, the state also argues that, even under the "substantial interjurisdictional investigative contacts" test adopted by the superior court, the evidence adduced at the evidentiary hearing established that the state's contacts with the federal government were minimal—at least for purposes of the concerns addressed by the constitutional privilege against self-incrimination. Our resolution of this case likewise makes it unnecessary to consider this issue.

Alaska Constitution's privilege against self-incrimination, dismissal is necessary to shield him from derivative nonevidentiary use of his federal testimony.

Schwin's argument chases its own tail; for it quickly circles back to its own point of origin: the question whether Alaska's broad constitutional privilege applies in any way to Schwin's federal testimony. However put, this question must be answered, no.

The answer is foreshadowed by the first two cases of the *Hazelwood* trilogy.[8] Hazelwood was convicted of negligent discharge of oil. The investigation that led to his conviction was launched by his own radioed report of an oil spill, a report that Hazelwood claimed was covered by a grant of use and derivative use immunity set out in a federal statute. On appeal to this court, Hazelwood claimed that virtually all of the prosecution's evidence at trial had derived from his immunized report and thus should have been excluded. The state responded, in relevant part, that even if its investigative evidence derived from Hazelwood's immunized report, it would inevitably have been discovered and was thus admissible under the inevitable discovery doctrine.

In *Hazelwood I,* this court observed that, although the inevitable discovery doctrine was well entrenched in federal law, it had never been adopted as a matter of Alaska law. Mistakenly assuming that Alaska law governed the procedural enforcement of Hazelwood's federally granted immunity, we went on to apply case law dealing with Alaska's constitutional privilege against self-incrimination, and we concluded, as a matter of state constitutional law, that the inevitable discovery doctrine could not be extended to immunity cases. On this basis, we reversed Hazelwood's conviction.

In *Hazelwood II,* the Alaska Supreme Court disabused us of our mistaken assumption; the court held in no uncertain terms that because Hazelwood had been granted immunity under federal law, both the substantive scope and the procedural enforcement of his immunity right were issues to be decided under federal law, not state law:

> The scope of immunity under [the federal statute], and its constitutionally permissible exceptions, are issues of federal law. Thus United States Supreme Court precedent, rather than our own precedent, controls our resolution of this case.

*Hazelwood II,* 866 P.2d at 829 n. 1.

The supreme court's decision in *Hazelwood II* finds reinforcement in *Hazelwood III,* the third case of the *Hazelwood* trilogy. Shortly before reversing in *Hazelwood II,* the Alaska Supreme Court had issued its decision in *State v. Gonzalez,* adopting transactional immunity as a matter of state constitutional law. The timing of *Gonzalez* precluded any consideration of its ramifications in *Hazelwood II.* On remand to this court, however, Hazelwood argued for the first time that he was entitled to transactional immunity under *Gonzalez.* Hazelwood's argument was, in relevant part, a virtual analog of Schwin's argument here:

> Hazelwood points out that in deciding that the Alaska Constitution requires transactional immunity, *Gonzalez* expressly concluded that use and derivative use immunity can never adequately protect against the potential danger of nontestimonial use of immunized statements. 853 P.2d at 532. Hazelwood thus reasons that under *Gonzalez,* the danger of nontestimonial use must always preclude a finding of inevitable discovery.

*Hazelwood III,* 912 P.2d at 1270 n. 4.

We rejected this argument in *Hazelwood III* on two separate grounds, one being that it was foreclosed by the Alaska Supreme Court's decision in *Hazelwood II. Id.*

When read together, the *Hazelwood* trilogy seems preclusive of Schwin's argument here. Schwin received use and derivative use immunity from the federal government in a federal proceeding; under the *Hazelwood* trilogy the scope of his immunity and its constitutionally permissible implementation

---

**8.** *See Hazelwood v. State,* 836 P.2d 943 (Alaska App.1992) (*Hazelwood I*); *State v. Hazelwood,* 866 P.2d 827 (Alaska 1993) (*Hazelwood II*) (reversing *Hazelwood I*); and *Hazelwood v. State,* 912 P.2d 1266 (Alaska App.1996) (*Hazelwood III*) (on remand from *Hazelwood II*).

"are issues of federal law." *Hazelwood II,* 866 P.2d at 829 n. 1.

We arrive at the same result through straightforward application of principles commonly deemed implicit in the privilege against self-incrimination. The privilege has recently been held to regulate only state action. *See Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). As Schwin himself recognizes, Alaska's constitutional privilege does not control the conduct of private citizens or others not engaged in state action. Thus, Alaska has no clearly defined interest in enforcing the privilege's more rigorous Alaskan requirements against persons carrying out the laws of other jurisdictions—that is, against persons involved in "state action" only on behalf of other states or jurisdictions. *See, e.g., State v. Bradley,* 105 Wash.2d 898, 719 P.2d 546 (1986); *State v. Olsen,* 212 Or. 191, 317 P.2d 938 (1957).

Alaska's duty to recognize and enforce grants of immunity conferred by other jurisdictions emanates uniquely from the federal constitution's privilege against self-incrimination. *See Murphy v. Waterfront Comm'n of New York Harbor,* 378 U.S. 52, 79, 84 S.Ct. 1594, 1609–10, 12 L.Ed.2d 678 (1964). No portion of Alaska's constitutional privilege purports to recognize or require enforcement of extrajurisdictional grants of immunity, nor has Alaska's privilege been construed to prohibit the use of statements compelled by private citizens or by persons who are not themselves subject to its strictures. *Cf. Macauly v. State,* 734 P.2d 1020, 1023 & n. 2 (Alaska App.1987); *see also D'Antorio v. State,* 837 P.2d 727 (Alaska App.1992); *Pooley v. State,* 705 P.2d 1293 (Alaska App.1985).

■ For this reason, we fail to see how the Alaska Constitution's requirement of transactional immunity can properly be deemed to extend in any manner to Schwin's federal grant of use and derivative use immunity without, at a minimum, some threshold showing that his grant of federal immunity involved state action—that is, conduct engaged in by the State of Alaska; by its officers, employees or agents; by persons acting in concert with them or at their behest; or by persons somehow otherwise acting under color of state law. *Cf. State v. Mollica,* 114 N.J. 329, 554 A.2d 1315 (1989); *State v. Knight,* 283 N.J.Super. 98, 661 A.2d 298 (App.Div.1995), *aff'd,* 145 N.J. 233, 678 A.2d 642 (1996); *State v. Hudson,* 849 S.W.2d 309 (Tenn.1993); *State v. Johnson,* 75 Wash.App. 692, 879 P.2d 984 (1994).[9]

Nevertheless, relying on the close strategic interconnection of the state and federal investigations in his case and on the superior court's finding of substantial interjurisdictional contacts, Schwin argues that state conduct has in fact been shown. We reject this argument.

The superior court did not find that federal prosecutors acted at the state's behest in deciding to grant Schwin immunity. Indeed, the superior court's substantial interjurisdictional contacts findings belie any such conclusion, since those findings repeatedly emphasize the court's impression that federal prosecutors acted independently of the state and in furtherance of federal prosecutive interests when they granted Schwin immunity. The superior court's findings likewise repeatedly emphasize that substantial interjurisdictional contacts occurred only after the federal decision to grant immunity had already been made.

■ Even if it were otherwise—that is, even if the evidence adduced below clearly showed that federal prosecutors did act at state behest in granting Schwin immunity— we would be constrained to hold that transactional immunity is not justified under the facts of Schwin's case. For even if there were evidence demonstrating that federal prosecutors allied themselves with the state

---

9. This line of cases, all involving lawful federal conduct allegedly violating stringent state constitutional provisions governing searches and seizures, adopts a broad definition of agency to determine the presence of state action triggering state constitutional protection. The superior court in the present case categorically rejected this line of cases as irrelevant to Schwin's situation, because Schwin's case involved the privilege against self-incrimination whereas the cited cases dealt with search and seizure claims. We are not convinced that the superior court's out-of-hand rejection of these cases is warranted. Our holding in Schwin's case, however, makes it unnecessary to decide the point.

in granting Schwin immunity, and even if Alaska thereby acquired a legitimate constitutional interest in preventing the federal prosecutors from violating Schwin's state-defined privilege against compulsory self-incrimination, Alaska could have no legitimate interest in giving Schwin more protection than he freely bargained for.

Here, Schwin's formal grant of immunity devolved from a federal plea bargain, an integral part of which entailed Schwin's agreement to testify truthfully in federal court as a government witness against Donnelly. In return, the federal government committed itself to grant Schwin immunity and to formally compel his testimony. Schwin's acceptance of the plea agreement was presumably knowing and voluntary: he was represented by counsel; he obviously knew of the state's interest in prosecuting him for Koch's murder; and he has evidently never sought to withdraw his federal guilty plea as involuntarily entered.

What Schwin specifically agreed to—all that he agreed to—was a grant of use and derivative use immunity. Nothing more. Had Schwin wanted to hold out for transactional immunity from state prosecution when he engaged in federal plea bargaining, he could have done so and should have done so. *Cf. State v. White*, 96 Or.App. 713, 773 P.2d 824, 825 (1989) ("[White] may not now transform the immunity that he accepted into something that he would have preferred."); *see also State v. Graf*, 114 Or.App. 275, 835 P.2d 934, 937 (1992), *aff'd*, 316 Or. 544, 853 P.2d 277 (1993). He did not. In prosecuting Schwin for murder, the state seeks only to hold Schwin to the terms of his federal bargain.

Why Alaska should have any interest in giving Schwin something more remains shrouded in mystery.[10] Schwin argues that, in the face of a federal court order compelling him to testify in exchange for use and derivative use immunity, it would have been futile for him to demand more. Schwin insists that, as a matter of federal law, he was entitled to receive only use and derivative use immunity, and federal prosecutors had no authority to grant him transactional immunity.[11]

But Schwin shoots his arrows at the wrong target. At issue here is not whether Schwin was entitled to hold out for more when the federal district court ordered him to testify at Donnelly's trial after the government had formally granted him use and derivative use immunity. Rather, the issue here is whether Schwin was free to hold out for more than use and derivative use immunity at an earlier juncture: when he engaged in plea bargaining with his federal prosecutors and ultimately accepted a bargain for use and derivative use immunity.[12]

The record provides no reason to suppose that Schwin could not have held out for more than use and derivative use immunity at this earlier juncture. In this regard, it seems utterly beside the point to argue, as does Schwin, that federal prosecutors had no authority to formally grant transactional immunity from federal prosecution. What Schwin presumably wanted most was transactional immunity from state, not federal, prosecution. While federal prosecutors had no direct authority to grant him that, state prosecutors—who by Schwin's own account were working hand-in-glove with his federal prosecutors—unquestionably did.

Hence, no insuperable legal obstacle prevented Schwin from bargaining for transactional immunity from state prosecution as

---

**10.** We have consistently recognized that "[i]mmunity agreements are contractual in nature and general principles of contract law apply to the resolution of disputes concerning their enforcement and breach." *Betts v. State*, 799 P.2d 325, 327 (Alaska App.1990) (quoting *Closson v. State*, 784 P.2d 661, 664 (Alaska App.1989), *rev'd on other grounds*, 812 P.2d 966 (Alaska 1991)).

**11.** *See, e.g., United States v. Harvey*, 869 F.2d 1439, 1443 (11th Cir.1989); *People v. Phillips*, 97 Misc.2d 665, 412 N.Y.S.2d 94 (N.Y.App.1979).

**12.** We thus readily accept Schwin's contention that the federal court's order actually compelled him to testify in exchange for use and derivative use immunity and that the United States Constitution's privilege against self-incrimination requires Alaska to honor the federal immunity grant.

part of his federal plea agreement. Had he asked for transactional immunity from state prosecution as part of his federal plea agreement and been denied, the denial would not have come from lack of authority but from lack of state or federal willingness—a risk inherent in any bargaining situation. And even if denial were inevitable, Schwin would not have been—and in fact never has been—under any legal compulsion to accept an unsatisfactory plea bargain or to engage in federal plea bargaining at all.[13]

We thus conclude that, regardless of whether federal prosecutors in this case engaged in state action of the kind sufficient to trigger the protections of the Alaska Constitution's privilege against self-incrimination, Alaska has no constitutional obligation to ensure Schwin any higher level of protection than that which he freely bargained for and accepted: a grant of use and derivative use immunity, enforceable under prevailing federal law.

To hold otherwise would have the paradoxical effect of applying Alaska's constitution more rigorously to federal grants of immunity than to state grants. There can be little doubt that if Schwin and Donnelly had initially faced state, rather than federal, drug charges, state prosecutors would have been free to offer Schwin a plea bargain including a provision for use and derivative use immunity, rather than transactional immunity, in return for testimony against Donnelly.[14] Faced with this offer, Schwin would certainly have been entitled to hold out for more—or to reject the plea bargain altogether and face trial. But if he accepted the offer without bargaining for more, he could hardly be heard to later claim that the Alaska Constitution entitled him to transactional immunity. Yet in the present case, apart from the fact that Schwin struck his plea bargain with federal prosecutors instead of state prosecutors, this is precisely Schwin's situation and precisely his argument.

In summary, we hold that the superior court erred in applying the Alaska Constitution's requirement of transactional immunity to Schwin's case. Schwin's federal immunity must be enforced in accordance with applicable federal law.[15] This level of enforcement

13. We emphasize that nothing in the record supports a conclusion that federal prosecutors would have compelled Schwin to testify against Donnelly under a grant of federal immunity but for Schwin's willingness to accept a plea bargain calling on him to admit his guilt to the federal drug conspiracy charge and testify truthfully against his codefendant. This situation readily distinguishes Schwin's case from cases like In re Inzirillo, 542 F.2d 90, 91 (1st Cir.1976), which at first blush might seem to support Schwin's position.

Inzirillo was granted use and derivative use immunity by a federal grand jury in Massachusetts and was ordered by the federal district court to testify. He nonetheless declined, asserting that use and derivative use immunity would not protect him against nonevidentiary use of his federal testimony in an impending state prosecution. The federal district court held Inzirillo in contempt. In affirming the contempt order, the First Circuit held that Inzirillo's "remedy is not to remain silent, but to raise the issue of his immunity in the state proceeding." Id.

Only if Schwin's situation at the juncture of his plea bargain had involved true legal futility—both in terms of his ability to ask for transactional state immunity and his ability to decline to engage in plea bargaining—could he plausibly rely on Inzirillo to argue that his proper remedy was "to raise the issue of his immunity in the state proceeding." Id. And we hasten to add that even then, Schwin's right to claim transactional immunity in state court would presuppose his ability to show that the federal grant of immunity somehow amounted to state action.

14. Cf. United States v. Gutierrez, 696 F.2d 753, 756 & n. 6 (10th Cir.1982) (refusing to give use and derivative use immunity to a person who made a voluntary statement in exchange for police agreement not to prosecute a specific case).

15. We note that the superior court's factual findings on the issue of substantial interjurisdictional investigative contacts strongly suggest that the evidence presented at the evidentiary hearing would support a finding that the state's homicide prosecution might actually be tainted by nonevidentiary use of Schwin's federal testimony. As we have already observed, however, the superior court expressly declined to characterize the evidentiary proceedings held below as the equivalent of a "taint" hearing. The issue of taint has thus not fully been heard. Moreover, the court's factual findings suggest the existence of taint only if we assume that potential nonevidentiary use would suffice to establish taint under current federal law governing derivative use of immunized testimony. This is a legal issue that the parties have not briefed; we do not address or express any view on this issue, which remains to be developed and ruled on in the superior court.

may not afford Schwin sufficient protection against nonevidentiary use to meet the more rigorous standards imposed by the Alaska Constitution, but it will meet the less demanding requirements of the United States Constitution. In the unique circumstances presented here, Alaska owes Schwin no greater protection than the United States Constitution demands.

The superior court's order of dismissal is REVERSED, and this case is REMANDED for further proceedings consistent herewith.